**UNITED STATES of America, Plaintiff,**

v.

**Johann Peter GRZEGANEK, Defendant.**

**No. 93–6010–CR–NCR.**

United States District Court,
S.D. Florida,
Fort Lauderdale Division.

Dec. 30, 1993.

**1170**

James Boma, Asst. U.S. Atty., Office of U.S. Atty., Fort Lauderdale, FL, for plaintiff.

Stephen J. Finta, Fort Lauderdale, FL, for defendant.

## MODIFIED ORDER ON SENTENCING

ROETTGER, Chief Judge.

This case reflects the system of justice at its very worst up until the day of sentencing.

### STATEMENT OF THE FACTS [1]

Defendant was arrested in Fort Lauderdale and charged with four counts of interfering with a member of an airline's flight crew member in the performance of her duties; all four of these persons were flight attendants (these four counts were based on 49 App., U.S.C. § 1472(i)). The fifth count charged defendant with endangering the safety of the passengers and crew in violation of 18 U.S.C. § 32(a)(6).

Defendant was indicted, counsel was appointed under the Criminal Justice Act to

represent him, and a Not Guilty plea was entered.

Bond was entered in the amount of $50,000 corporate surety, but defendant was never able to meet bond; however, no appeal from the bond or its conditions was ever filed by defendant.

Not all of the evidence was fully developed in this case, as there was no trial. What evidence was received was presented to the court in somewhat unusual fashion as will be revealed in this order. To keep it in perspective, there was no bomb.

### TAKING OF THE PLEA

Defendant pled guilty in August of 1993 to the first four counts, at which time the court was left with considerable uneasiness as to whether a crime had been committed by defendant as charged in the indictment.

Defendant is a German resident and citizen who was visiting America on a two-week vacation.

At the time of the guilty plea entered by defendant no testimony was given by government agents, but the government made, with no objection by defendant, a proffer of the evidence it would expect to introduce if the matter went to trial. The government basically proffered that defendant was a passenger on a charter flight of American Trans–Air from Fort Lauderdale to Hannover, Germany, and that shortly after take-off defendant went to the middle of the plane, and acted as if he thought he was in the toilet. When defendant was stopped by flight attendants, he had announced "the roof was going to go". He then made a broad sweeping gesture which the attendants thought indicated an explosion would occur. The proffer continued: that defendant became a bit unruly, and the plane returned to Fort Lauderdale because of a fear that defendant had brought a bomb aboard the plane. The

---

**1.** This order is prepared for two purposes: intense news media interest and to provide some explanation to any interested German or American officials about what actually happened.

News media interest expressed in articles or broadcast items included both print and broadcast media, e.g., International Herald Tribune (front page), New York Times, Stars and Stripes,

CNN International, Front Page, and many others. All this resulted from coverage of the court proceedings by one local newspaper, Fort Lauderdale News and Sun–Sentinel.

Additionally, the court has received numerous inquiries from other print and broadcast media and writers as to future stories on the case. Unfortunately, no transcript has been prepared.

proffer further indicated a search of defendant's hand luggage had been conducted before returning to Fort Lauderdale; although it was heavy, it was apparently due to a camera, a jar of cold cream and clothing in defendant's satchel, but nothing resembling a bomb was located. Defendant was arrested after the plane had returned to Fort Lauderdale. (As stated earlier, there was no bomb). As a result, the flight missed its connection in Gander, Newfoundland with another flight from American Trans–Air, causing the company to divert the plane to New York City and pay for overnight lodging and meals for its passengers.

After the proffer, defendant asked if he could make a correction and it was as follows: that the gesture was "to show that his bladder was going to explode and not the roof of the aircraft."

Defendant also complained that although he'd spoken to one flight attendant in German, she soon left the midship's area and went to the front of the plane and then only English-speaking personnel were there with him.

The court asked defendant after the proffer what he meant by saying that the roof would go. Defendant's response was to the effect that: "well, if my bladder explodes, then also the roof would go". Although the

court was extremely reluctant to accept a guilty plea because the court had serious doubts that a crime had been committed, defendant's lack of any kind of rational explanation for that phrase caused the court to accept the guilty plea.[2]

A few days before the sentencing date scheduled about two months after the guilty plea, defendant favored the court with a letter, which stated that defendant was afraid to fly and that that fear, plus the fact it was the last night he and his friend had in America before returning to Germany, caused them to party all night. They then arrived at the airport the next day and after some coffee he had several more drinks at the airport.

Although defendant, at the time of taking the guilty plea, had said he was "drunk" on the plane, this is the first time the court had such a detailed explanation of his condition and the motivation for it.[3]

## THE SENTENCING HEARING

Possibly because of the court's stated uneasiness about accepting the guilty plea, the prosecution brought two of the flight attendants to the sentencing and offered them as witnesses.[4] The court asked defendant if he would like to withdraw his guilty plea and

2. The court speaks some German, but is far from being fluent. However, following the taking of the guilty plea, the court became convinced that this comment about the roof will go sounded like a German colloquialism, although the court had never heard such a colloquialism. As a matter of curiosity, the court asked Germans, during a visit to Germany between the taking of the guilty plea and the sentencing, as well as discussed the matter with other persons here in America having some familiarity with the German language. No one indicated any awareness of it.

On the morning of the sentencing, the court was advised by an American, married to a native German, that there was a German colloquialism, although not necessarily widely used: "dann fliegt das Dach", which literally means in English that: "then the roof flies"; it is a colloquialism for urgently needing to go to the restroom.

After the sentencing the court has inquired of other native Germans and has found one who also understood that phrase to mean an urgent need for the person to go to the restroom.

3. The court received defendant's letter as an exhibit. There was corroboration of defendant's fear of flying and that defendant drank before a

flight to overcome his fear. This corroboration came in the form of affidavits of two of defendant's brothers.

The brothers were present for the first sentencing date, but could not remain the extra week; the affidavits were filed after the first scheduled sentencing date, but before the second scheduled sentencing date, one week later. The first sentencing date was continued because of the death the day before of the undersigned judge's mother. Therefore, the court considered the affidavits as if made under oath at allocution.

The affidavits revealed that one of defendant's brothers had alcoholic intolerance and described defendant as someone who seldom drank, but at least one prior event in Germany led them to suspect defendant has a similar intolerance for alcohol.

4. One of the flight attendants, Ms. Blades, stated another flight attendant, Ms. Jones, had "more rapport" with defendant, but she was not present in court.

defendant indicated he wanted to do that. Before ruling the court wanted to hear the testimony of the flight attendants in the hopes they would shed more light on whether a crime had been committed as charged in the indictment.

The testimony of the two flight attendants indicated a series of events different from the ones the court had understood at the time of taking the guilty plea, which indicated that what happened on the flight was basically as set forth in this section.

Flight 842 was operated by American Trans–Air, based in Indianapolis, Indiana, and was a charter flight, although 40% of their flights are scheduled. The equipment was a Lockheed 1011 and was bound from Fort Lauderdale to Hannover, Germany, with a stop in Gander, Newfoundland. There were 326 passengers aboard, all of whom were German. There were four flight attendants to provide services to the passengers, but only one of them was German-speaking.

Beate Westerhouse[5] was the only flight attendant who spoke German as she was born and raised in Germany where she lived near Hannover for the first 19 years of her life.[6] She was at the entrance of the aircraft when defendant came on board and described defendant as "drunk" when he came on board; further, that defendant had a bottle, as well as a Coca–Cola with booze in it because she could smell the liquor in the Coca–Cola. She advised defendant that American Trans–Air had a right not to take him if he did not obey the rules and further threatened to throw him off the plane in Gander, Newfoundland if he did not behave. However ominous a threat that may have been to a sober person, one can only speculate as to what that meant to someone per-

ceptibly "drunk" who did not reside in North America.

When the plane reached about 10,000 feet of altitude after its take-off from Fort Lauderdale, Ms. Westerhouse got up from her seat and noticed that defendant then got up from his seat although the Fasten Seat Belt sign was still illuminated. Defendant went to a cross-ships passage in the L–1011 and when the flight attendants got there, he was fiddling with his trousers as if he thought he was in the restroom. Ms. Westerhouse tried to talk with defendant, but he wouldn't talk with her so she went to talk with his friend, supposedly a lawyer. She asked defendant's friend how drunk is defendant and the friend replied that he would try to get defendant to sit down and made an effort to do so, but a fight or shoving match ensued between the two. Defendant's friend then returned to his seat. Ms. Westerhouse had warned defendant's friend before he came to the cross-ships passage not to get into a fight with defendant.

She testified that defendant said "no, no, the roof will go if I sit down" when she tried to get him to retake his seat. Ms. Westerhouse thought defendant meant the roof would explode and thought of a bomb. The flight engineer and a dead-heading pilot or engineer were summoned and came back, but declined to intervene.

She admitted defendant never used the word "bomb"[7]; the word is a cognate in English, so if defendant had used it, even the personnel speaking only English would have understood it.

Then defendant broke away from the cross-ships passageway after flight personnel were trying to get him to sit down and went back to the restroom. After he relieved himself in the restroom, defendant quietly

---

5. Not her maiden name.

6. Defendant also lives near Hannover.

7. The court had suspected that another word, a cognate in derivation, might have caused the misunderstanding if said to an English-speaking attendant: that word is *explodieren*, which is "to explode" in English.

   In defendant's letter to the court shortly before sentencing, Defendant described in German what he said and had used this word. Defendant's

version in his letter, received by the court as an exhibit, was that he said to Ms. Westerhouse in German, "(*ich hab so einen druck auf der blase das ich gleich explodiere*)"; this translates basically, in English, as ("That I have to go to the bathroom, my bladder is full and going to explode)".

   In light of defendant's inebriation at the time, the court has some skepticism about the accuracy of defendant's recollection.

returned to his seat, sat down and went sound asleep. Subsequently, the pilot returned to Fort Lauderdale.

Ms. Westerhouse testified she meant to ask defendant's friend what defendant meant about the roof "going" because defendant had told her "ask my friend" when she inquired of defendant about the meaning of that phrase, but she failed to ask him.

Ms. Westerhouse acknowledged upon examination by the court that usually flight attendants do not interfere with passengers who are trying to go to the restroom even though the Fasten Seat Belt sign is still illuminated, absent turbulence.

Another flight attendant, Ms. Blades, indicated defendant appeared to be "woozy" and she thought he was going to be sick. When she tried to get him to return to his seat, he shoved her out of the way and she warned the other flight attendants about defendant. She, too, didn't hear the word "bomb". She further testified defendant was a belligerent drunk and that it would have been better not to have let him on board.

FBI agent Juan Molina testified that when he spoke to him after the plane returned to Fort Lauderdale, defendant was babbling and kept referring to Agent Molina as Mickey Mouse.

## RESOLUTION

The court indicated it was inclined to grant defendant's request to withdraw his guilty plea and proceed to trial and asked the government if it considered recommending a sentence of time served based on a downward departure for "a single act of aberrant behavior" under Rule § 1A4(d) of the Sentencing Guidelines. Although defendant's immigration attorney preferred to go to trial, counsel of record agreed with a "time served" disposition of the case; defendant agreed, as did the government.[8]

The court must now observe that, unless the government had more convincing evidence than presented by the two flight attendants who seemed to be the most closely involved in the encounter with defendant on the plane, the court would have been constrained to grant a Rule 29 acquittal at the close of the government's case.

One cannot help but speculate that if American Trans–Air had been a daily carrier from South Florida to Germany, as is Lufthansa (non-stop), Delta, American, United and U.S. Air (with a change of planes) or a carrier flying several times a week non-stop between South Florida and Germany such as LTU, Hapag–Lloyd, or Condor, that it would have denied boarding to defendant at Fort Lauderdale because of his inebriation and offered him a ticket on a subsequent flight.

A thorough search of the plane and defendant's luggage was made and no bomb was found. In view of that circumstance, this court cannot understand how this indictment was brought if the U.S. Attorney's office made an attempt to elicit from flight attendants what happened at the beginning of that flight and on the flight, such as the fact the flight attendants heard nothing about a bomb and testified to nothing about an explosion. The court, in a few minutes of questioning of the two flight attendants who seemed to be most involved in this matter, could elicit a rather clear explanation of what happened on the flight and that defendant was simply drunk and should have been denied boarding[9], and became belligerent because people were presenting obstacles to his desire to go to the restroom and relieve himself.

His conduct is not to be commended or condoned; but neither is that of the flight crew on Flight 842.[10] Most importantly, when one asks sufficient questions of the flight personnel instead of searching for evidence to support an indictment, one quickly discovers a non-culpable explanation for what happened on Flight 842. The court must conclude the U.S. Attorney's office never

---

**8.** Defendant was facing a guidelines sentencing range of 30 to 37 months imprisonment for the offense charged in Count I.

**9.** 49 C.F.R. 135.121(c) states: "No certificate holder [American Trans–Air] may allow any per-

son to board any of its aircraft if that person appears to be intoxicated."

**10.** Under these circumstances the carrier is not awarded any restitution for damages.

bothered to obtain or, if obtained, evaluate the available evidence to see if it excluded every reasonable doubt as to defendant's guilt.

If defendant ever seeks to come to America again, this conduct most certainly should not be the basis for excluding him, although one must hope he would control his drinking to a considerably greater extent the next time.[11]

Defendant was sentenced to time served plus an assessment of TWO HUNDRED & 00/100ths ($200.00) DOLLARS. Count V was dismissed.

DONE AND ORDERED at Fort Lauderdale, Florida this 30 day of December, 1993. Nunc Pro Tunc as of date of Sentencing (October 20, 1993).

---

11. As a final indignity to defendant, the United States Immigration and Naturalization Service had placed a detainer upon defendant so that he could not be released upon the court's order of release following the imposition of a sentence of time served at the close of sentencing. The reason for the detainer was that defendant's visa had expired while he was in custody and he was therefore detained for a few more days before being returned to his native Germany.